IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-335

No. COA21-608

Filed 17 May 2022

Guilford County, Nos. 10 JA 158, 10 JA 159, 15 JA 141, 19 JA 264

IN THE MATTER OF:

N.L.M., T.R.M. IV, N.S.W., C.M.

Appeal by Respondent-Mother and Respondent-Father from order entered 2 August 2021 by Judge Angela C. Foster in Guilford County District Court. Heard in the Court of Appeals 26 April 2022.

*Mercedes O. Chut for Petitioner-Appellee Guilford County Department of Social Services.*

*Stam Law Firm, PLLC, by R. Daniel Gibson, for Respondent-Appellant Mother.*

*Richard Croutharmel for Respondent-Appellant Father.*

*Keith Karlsson for Guardian ad Litem.*

COLLINS, Judge.

¶ 1     Respondent-Mother and Respondent-Father appeal the trial court's order adjudicating one of their children abused and neglected and their three other children neglected, ordering the children to remain in the legal and physical custody of the Guilford County Department of Social Services, ordering the parents to comply with the case plan to effect reunification, and maintaining the suspension of the parents'

visitation rights with all four juveniles.  We affirm.

## I.    Background

Mother and Father are the parents of four children: Naomi, Timothy, Nancy, and Cameron.[1]  Mother and Father are not married, and Father does not live in the home with Mother and the four children, but he does visit the home daily and cooks for the family members.  In 2015, Nancy was adjudicated neglected, placed in foster care, and eventually returned to her parents' custody in March 2017.

On 27 February 2019, Guilford County Department of Social Services ("DSS") received a report stating that: Nancy was abused and neglected; Mother did not have a bond with Nancy and punishes and mistreats Nancy for bonding with a white foster mother when she was in foster care; Nancy "may be autistic, being that she does not cry when hit by [Mother]"; Nancy was being "burned by a flat iron and cigarettes, being locked in her room all day and she is only let out to go to the bathroom where she is left sitting for hours at a time"; Nancy was not being fed for days; and Mother is "believed to be an avid heroin user and keeps the drugs and the straw inside her [bra] and that she sells drugs as well."

That same day, a DSS social worker examined Nancy and reported that Nancy was very small for her age, weighing only 19 pounds at the age of four.  The social

---

[1] Pseudonyms are used to protect the identities of the minor children.

worker noticed that there were two small scars on the top of Nancy's shoulder and burn marks on her body. The social worker also spoke with the other three children, who disclosed that Nancy "is left in her bedroom all the time and would eat there" and "want[s] to come downstairs, but she was not allowed to."

¶ 5     On 1 March 2019, DSS received a second report alleging that Nancy was receiving improper medical and remedial care, had not been seen by a doctor since November 2016, and had not gained any weight since returning to Mother's custody when she was approximately 18-24 months old. That day, Nancy had been admitted to the hospital for severe malnutrition "and there were also concerns as to her having significant developmental delays." Nancy was diagnosed with "Severe Protein Malnourishment, Failure to Thrive, Developmental Delays and Norovirus." She gained four pounds while in the hospital and was eventually released into the care of her paternal grandmother. Mother stated, "I've been starving my child," but said she never meant to cause Nancy any harm.

¶ 6     Following Nancy's hospitalization, a DSS social worker spoke twice with Naomi and once with Timothy. Naomi stated that Nancy was "treated like a prisoner," that Father cooked food for Nancy and Mother brought it up to Nancy's room and they did not know what happens after the food is taken upstairs to Nancy, that Nancy was left alone on the toilet for hours at a time, and that Nancy had not left the home in 2019 until the hospitalization on 1 March 2019. She also stated that

she witnessed Mother and Mother's friends drink and "have needles with a 'white powdery stuff'" and that Mother told her they "use water to inject it and it helps [Mother] stay awake." Timothy also stated that he was "unsure if Nancy was getting the food" that Mother took upstairs, that Nancy "was not allowed outside of her bedroom unless she was going to the bathroom," and that Mother left Nancy on the toilet for hours at a time, and one time forgot Nancy was there.

¶ 7        DSS filed juvenile petitions on 8 March 2019 alleging that Nancy was abused and neglected and that Cameron was neglected. On 12 March 2019, DSS filed petitions alleging that Naomi and Timothy were neglected. The trial court ordered forensic examinations of Naomi and Timothy, and it ordered Mother and Father to have no contact with Nancy and Cameron. All four children were placed into an emergency placement with their paternal grandmother. The forensic examinations took place in April 2019. Sometime around 11 May 2019, Mother was charged with felony child abuse inflicting serious bodily injury and Father was charged with aiding and abetting felony child abuse inflicting serious bodily injury.

¶ 8        In July 2019, the trial court continued the matter for various reasons and ordered that neither parent have visitation. The matter was continued again in September 2019 when Mother requested to represent herself, signed a waiver of counsel, and stated that she would be hiring her own counsel; her court-appointed attorney was released. The matter was continued again in December 2019 when

Mother stated that she was no longer able to retain private counsel; the trial court appointed new counsel for Mother. Mother's appointed counsel sought and was granted another continuance in January 2020 to prepare for the case. There were additional continuances granted throughout 2020 due to the COVID-19 pandemic, but the trial court found on 19 January 2021 that it had continued the matter several times at the request of Mother and that "this shall be the final continuance allowed at the request of [Mother]." The matter was continued twice more in early 2021 because the attorneys were not available.

¶ 9     The adjudication hearing was held on 26 May 2021, during which Nancy was adjudicated abused because her parents created or allowed to be created a substantive risk of serious physical injury to her, and all four children were adjudicated neglected as they did not receive proper care, supervision, and discipline from their parents and lived in an environment injurious to their welfare. The trial court proceeded directly to the dispositional hearing and found that it was in the best interests of the children to remain in DSS custody and remain in the kinship placement with their grandmother. The trial court maintained the suspension of visitation as to both parents. Mother and Father timely appealed.

## II.     Discussion

### A. Mother's Appeal

#### 1. *Reasonable Efforts*

¶ 10 Mother first argues that because she "took responsibility for her mistakes and was willing to correct them, the trial court erred in concluding that DSS made reasonable efforts to prevent placement."

¶ 11 The reasonable efforts determination is a conclusion of law because it "require[s] the exercise of judgment." *In re Helms*, 127 N.C. App. 505, 510-11, 491 S.E.2d 672, 676 (1997). "Our review of a trial court's conclusion of law is limited to whether they are supported by the findings of fact." *Id.* at 511, 491 S.E.2d at 676 (citing *In re Montgomery*, 311 N.C. 101, 111, 316 S.E.2d 246, 253 (1984)). Unchallenged findings of fact are "deemed to be supported by the evidence and are binding on appeal." *In re J.C.M.J.C.*, 268 N.C. App. 47, 51, 834 S.E.2d 670, 673-74 (2019) (citation omitted).

¶ 12 N.C. Gen. Stat. § 7B-903(a3) states that an order shall contain

> specific findings as to whether the department has made reasonable efforts to prevent the need for placement of the juvenile. . . . The court may find that efforts to prevent the need for the juvenile's placement were precluded by an immediate threat of harm to the juvenile. A finding that reasonable efforts were not made by [DSS] shall not preclude the entry of an order authorizing the juvenile's placement when the court finds that placement is necessary for the protection of the juvenile.

N.C. Gen. Stat. § 7B-903(a3) (2021).

¶ 13 N.C. Gen. Stat. § 7B-101(18) defines reasonable efforts as the "diligent use of preventative or reunification services by [DSS] when a juvenile's remaining at home

or returning home is consistent with achieving a safe, permanent home for the juvenile within a reasonable period of time." N.C. Gen. Stat. § 7B-101(18) (2021). Additionally, while our statutes do not include a definitive list of the services which may be provided as a part of reasonable efforts, there is a

> federal regulation setting forth a nonexclusive list of services which may satisfy the reasonable efforts requirement. . . . i.e., crisis counseling, individual and family counseling, services to unmarried parents, mental health counseling, drug and alcohol abuse counseling, homemaker services, day care, emergency shelters, vocational counseling, emergency caretaker . . . .

*In re DM*, 211 N.C. App. 382, 386, 712 S.E.2d 355, 357 (2011) (quoting *In re Helms*, 127 N.C. App. at 512 n. 3, 491 S.E.2d at 677 n. 3).

¶ 14 Here, Mother does not challenge any of the trial court's findings of fact; they are thus binding on appeal. The trial court's relevant findings of fact include, *inter alia*, that:

> 32. On March 12, 2019, the juveniles were placed in a court approved kinship placement with their paternal grandmother, Annie McClenton. . . .
>
> 33. [Timothy] celebrated his 14th birthday on May 16, 2020. On July 13, 2020, [Timothy] completed the Casey Life Skills Assessment and his initial Transitional Living Plan was created with him. [Timothy's] Transitional Living Plan has been updated every 90 days.
>
> . . .
>
> 50. On August 20, 2019 a referral was completed to Family Solutions. On August 26, 2019, Megan Oaks with Family

Solutions, confirmed the referral was received and that she will reach out to the caregiver to schedule. . . . On September 16, 2019, a referral was completed to Saved Foundation. On September 21, 2019, [Cameron] completed a Comprehensive Clinical Assessment with Rhonda Blackburn. [Cameron] was diagnosed with Generalized Anxiety Disorder and outpatient therapy was recommended. [Cameron] participated in therapy with Ms. Blackburn and was successfully discharged on November 25, 2019.

. . . .

52. The mother entered into a case plan with the Department on January 28, 2020. The current case plan contains the following components:

> **Parenting Skills: The mother agrees to participate in a parenting psychological assessment and comply with any recommendations; successfully complete the Parenting Assessment Training and Education (PATE) Program; attend all visits, as scheduled, and comply with the visitation expectations once allowed by the court; and enter into a voluntary support agreement with Child Support Enforcement.** On January 28, 2020, the Department submitted a referral to the Guilford County Department of Health and Human Services Clinical Team for the mother to participate in a parenting psychological assessment and PATE Classes. On that date, the mother indicated to the Department that she was not willing to participate in a psychological with the Department. It was explained to her that the Department would pay for the assessment [if] she uses a Department Clinician; however, the mother declined indicating that she will hire a clinician to complete the assessment. The mother was asked that she provide the Department with the contact information of the Clinician of her

choosing, so that they can be properly vetted. It was explained to the mother that any delay in identifying a clinician could be a delay in reunifying with her children. The mother participated in a parenting psychological assessment through the Department in 2015 for her previous foster care assessment. As of today's date, the mother has not completed a recent parenting psychological assessment. The Department emailed PATE facilitator, Demetria Powell-Harrison on February 23, 2020 to follow up on the status of the mother's referral. An update was requested from Ms. Powell-Harrison on July 20, 2020. Ms. Powell-Harrison reported that she mailed a copy of the pre-test to the mother to complete on May 19, 2020 and the mother was scheduled to be seen virtually on May 26, 2020. However, the mother claimed that she did not receive the pre-test or the invitation to the virtual meeting. The appointment was rescheduled for June 9, 2020. The mother participated in the appointment on June 9, 2020; however, she talked about COVID-19 and reported that she had not finished the pre-test. Another appointment was scheduled for June 10, 2020; however, the mother did not participate. On July 21, 2020, Ms. Powell-Harrison reported to the Department that she spoke with the mother on this date and the mother advised that she was not going to complete the PATE due to her attorney advising her not to do so because it will be admitting that she is guilty. On January 21, 2021, Ms. Powell-Harrison reported that she has not had any contact with the mother since July 21, 2020. The Department requested an update from Ms. Powell-Harrison; however, has received no response as of May 17, 2021.

**Substance Abuse: The mother agrees to participate in a substance abuse assessment and follow all recommendations; refrain from the use of any substances, legal or illegal,**

**including alcohol, for the purposes of intoxication. If pain medication is needed, the mother agrees to request a non-narcotic medication; and participate in random drug and alcohol screens at the request of the Department.** On January 28, 2020, the Department made a referral to the Department's Clinician for a Substance Abuse Assessment for the mother. The mother declined services from the Department, indicating that she will find an[] independent clinician. The mother agreed to provide the identification and contact information of the clinician of her choosing for the purposes of vetting and was explained that any delay in providing this information can result in a delay of reunification with the juveniles. As of today's date, the mother has not provided any identifying information as to any clinical services. On January 28, 2020, the mother denied any recent illegal drug use although she admitted that she used marijuana when she was a teenager. She also denied taking any medication that is not prescribed to her. However, she alleged she is prescribed Percocet's for back pain and a hernia by Dr. Williams, but she is transferring her care to Bethany's Pain Clinic. The Department requested that the mother sign consents for Dr. Williams and Bethany's Pain Clinic. [Mother] has not provided any signed consents as of today's hearing. The Department requested that the mother participate in a random drug screen on the following dates:

- November 1, 2019 – did not submit

- January 28, 2020 – submit by 12 pm, January 29, 2020. The mother reported that she would test positive for Percocet's only. Did not submit.

- April 1, 2020 – Governor's state wide stay at

home order put in place on March 27, 2020. The Department was advised that Social Workers should not direct parents to report to drug labs for the purpose of submitting drug screens while the order was in effect.

- June 10, 2020 – Social Worker Supervisor Haik received a voicemail message from [Mother] on June 9, 2020 at 5:16pm. [Mother's] speech was difficult to understand – slurring and at times incoherent. Social Worker Supervisor Haik called [Mother] and left a voicemail message requesting that she complete a random drug screen no later than 11:25am on June 11, 2020; did not submit.

- July 22, 2020 – The Department mailed [Mother] six random drug screen forms to be used for future drug screen requests.

- August 4, 2020 – submit by August 5, 2020. [Mother] advised that she is not going to do a drug screen and she does not know why the Department continues to ask her to go. Did not submit.

- August 6, 2020 – The mother's attorney, Jaren Dickerson, reported that [Mother] has refrained from the use of any substances, legal or illegal, including alcohol, for the purposes of intoxication.

- October 6, 2020 – Request complete drug screen within 24 hours. [Mother] responded "I'm not doing shit or answering questions" then disconnected the call. Did not submit.

- November 19, 2020 – Requested complete a random drug screen within 24 hours. After making this request, [Mother] disconnected the

call.  Did not submit.

- January 21, 2021 – Requested complete a random drug screen within 24 hours.  After making this request, [Mother] asked Social Worker Boyd to stop contacting her and she will not do anything until the case is adjudicated.  Did not submit.

- February 26, 2021 – the Department contacted [Mother], but the phone recording stated to contact her at [] due to her phone not working.  Social Worker Boyd called and spoke with [Mother].  She asked who was calling, Social Worker told her name and Title and she hung up the phone.  Did not submit.

- In May 2020, the Department received information, from a source who requested to remain anonymous reporting that he had personal knowledge of [Mother] and [Father] dealing drugs and pills through the mail to South Carolina.  The anonymous source claimed that [Father] buys prescription medication from other people (pain pills, Percocet, Hydrocodone, Oxymorphone).  The source claims that [Mother] pays half of the street cost to buy them in bulk and then she sells them to the residents in Hampton Homes.  The source made additional claims that [Mother] and [Father] have been allowed to visit with the children since they have been placed with Annie McClenton.

  **Domestic Violence/Family Relationships: the mother will not violate the terms of any new or existing 50-B protective orders; successfully complete the Domestic Violence Intervention Program (hereinafter "DVIP") for Women at Family Service of the Piedmont (hereinafter**

**"FSOP"); the mother will terminate any existing relationships that involve domestic violence, when it is safe to do so; and agree to notice the Department of any incidents of domestic violence.** On January 28, 2020, the mother denied any Domestic Violence since 2013; however, she agrees to participate in an assessment with FSOP to determine her need, if any for Domestic Violence services. The mother stated that she and [Father] are no longer in a relationship and they have not been in a relationship since prior to the children coming into foster care. [Mother] has not provided any information about her participation in services through FSOP or any other agency. On March 22, 2021, Social Worker Boyd contacted FSOP and left a voice message for Gabrielle Marcoccia, DVIP group leader. On May 19, 2021, a voicemail was left for Audrey Sa, Adult victim coordinator. On that same date, Audrey Sa returned the call to the Department indicating that she will check to see if the mother is enrolled in any classes and has a release on file, then she will send the Department an email with her findings. On June 12, 2020, [Mother] reported the following to Social Worker Supervisor Haik:

- I've never cut him [Father]. He cut himself.

- He beat me up so bad that day he knew he was going to go to jail.

- There was an incident on Valentine's Day this year {2020}, [Father] jumped on me and tried to choke me. There was a guy that I let stay in my house – helping him out – I kicked him out and he was staying in the woods – he ended up in the hospital.

> It was out of the blue.  He cannot have an adult conversation.
>
> - He is going to end up killing me or I am going to kill him.
>
> - He chased me from Greensboro to Randolph County in my car – bumping my car.  There was a guy driving my car.  The guy was the same guy that saw [Father] with my kids at Annie's house.
>
> - He keeps coming back around and acting like we're together.
>
> - If I am not with him, he wants me to suffer.

On August 6, 2020, the mother's attorney, Jaren Dickerson, reported that [Mother] has not violated the terms of any 50B Protective Orders. Attorney Dickerson also reported that there have been no new incidents of domestic violence since the mother entered into her case plan and she is not in a relationship that involves domestic violence.  According to the 911 Log on February 8, 2021 there was a call to the home of [Mother] at [] for shots fired at them in their vehicle.  On March 5, 2021, Social Worker Boyd completed a community visit to the home and saw the Volvo that was identified by John McClenton as the car [Mother] drives.  There was a Volvo outside of the residence when Social Worker arrived.  Social Worker observed that the driver's side tail light was missing from the vehicle.  On March 22, 2021, social worker spoke with Chris Patterson, Chief Administrator about a possible police report.  She stated that 2021-0208106 is the case report number for the incident.  On March 22, 2021, Social Worker requested the 911 log for the

home of [Mother] which was received.

**Mental Health: the mother will participate in a mental health assessment and/or psychiatric assessment to determine her need for mental health services and comply with all recommendations; take any medication that is prescribed to her in the manner that it is prescribed.** On January 28, 2020, the mother reported that she is not currently participating in any mental health services and she has never been diagnosed with any mental health disorder. She also reported that she is not currently prescribed any medication for mental health reasons. Social Work Supervisor Haik inquired if the mother will participate in an assessment at FSOP or Monarch to determine her need, if any for mental health services. The mother reported that she probably needs the service, but she is not sure if she is willing to participate in an assessment or service. The Department discussed with the mother that FSOP and Monarch are options for this service and both providers have walk-in hours to initiate services. On May 7, 2020, the mother reported that she has not participated in any services due to COVD-19. The mother was advised by that Monarch is able to work with clients via telephone or virtually. The mother stated that she will contact Monarch so that they can document her thoughts. As of today's date, the mother has not provided any information regarding her participation in mental health services.

. . . .

65. The barriers to achieving reunification are:

- CPS history including prior foster care cases

- severity of medical neglect for [Nancy]

- the mother executed an Out of Home Family Services agreement; however she has declined to work with [DSS], contracted providers and elected to hire independent providers. The mother has not engaged in any services

- both parents have pending criminal charges in relation to the abuse and neglect that [Nancy] suffered

- The father has incurred additional criminal charges since the children have been in foster care

- [Father] has failed to admit that he has been the perpetrator of domestic violence despite the criminal convictions for Felony Assault by Strangulation and Assault on a Female

- The parents have provided conflicting information about the status of their relationship and engagement in domestic violence

- Both parents fail to acknowledge the abuse/neglect that the juveniles have suffered

- Both parents fail to acknowledge their role in the abuse/neglect that the juveniles have suffered.

66. Since the filing of the Petition and assumption of custody of the juvenile, [DSS] has made the following reunification efforts:

- Foster Care Case Management

- Child Forensic Evaluation

- Kinship assessment and placement

- CFT meetings

- Presentation of Out of Home Family Services Agreement

- Referrals of Services for the parents

- Record requests for parent's treatment providers

- Contact with the parents

- Review of CPS records

66. The above-referenced efforts are reasonable.

¶ 15    These unchallenged findings support the trial court's conclusion of law that DSS "made reasonable efforts to prevent the need for placement, taking into consideration the juveniles' health and safety as the paramount concern, and the Department made and should continue to make reasonable efforts toward reunification." *See In re Rholetter*, 162 N.C. App. 653, 662, 592 S.E.2d 237, 242-43 (2004).

¶ 16    Mother further argues that Nancy was "not at an imminent risk of harm" because the petition alleged abuse and "the only evidence of physical harm to Nancy" were hearsay statements made by Naomi and Timothy. Mother argues that "the trial court erred by admitting those statements because they were hearsay that did not fall within an exception." However, the trial court's unchallenged findings show that a DSS social worker observed that Nancy was "very small" for her age and only weighed 19 pounds at the age of four, she had "two small scars on the top of [Nancy's] right shoulder, her skin was very dry, and there were burn marks observed on her."

Additionally, the findings show that Nancy was admitted to the hospital and diagnosed with severe protein malnourishment, failure to thrive, developmental delays, and Norovirus and that "[a]ll medical testing results were consistent that [Nancy] was suffering from severe malnutrition deficits." These findings support the trial court's conclusion that DSS made reasonable efforts to prevent placement while taking into consideration Nancy's health and safety as the paramount concern.

### 2. Due Process

¶ 17       Mother next argues that (1) the denial of her motion to continue denied her effective counsel and violated her due process and (2) the trial court's commentary and questions denied Mother an impartial hearing.

¶ 18       First, Mother misrepresents what took place at the hearing, as Mother never made a motion to continue. At the beginning of the adjudicatory hearing, Mother's court-appointed attorney informed the trial court that Mother did not want him to be her attorney for the hearing or moving forward and Mother confirmed that she wished to release her attorney and represent herself at the hearing. The trial court then engaged in a colloquy with Mother about her choice to proceed pro se; Mother confirmed and stated, "Yes. I feel like that's in my best interest." The trial court informed Mother of how the hearing would be conducted and confirmed with Mother again that she understood the process; Mother confirmed that she understood and replied, "Awesome."

¶ 19 At the beginning of the dispositional hearing, the trial court and Mother again engaged in a discussion of whether she would represent herself or whether she would like to retain her court-appointed attorney for assistance. The trial court told Mother that she would not be getting additional time, and Mother stated to the trial court that she was "not asking for extra time." When the trial court stated that it would not grant a continuance in the future unless there was an exceptional circumstance, Mother replied, "You know, you misunderstood me," and then she clearly stated that she was ready to go forward with disposition. As Mother did not make a motion to continue, the trial court could not have erred by denying her motion. Accordingly, the trial court did not deny her effective counsel or violate her due process rights.

¶ 20 We next address Mother's argument that the trial court's commentary and questions denied her an impartial hearing. Mother argues that the trial court "violated her constitutional rights" by "denying [her] due process by denying her a fundamentally fair hearing." We note that Mother did not raise this issue at the trial court and has thus failed to properly preserve this issue for appeal. As Mother failed to present "to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make," as required by N.C. R. App. P. 10(a)(1), she has waived appellate review of the issue. *See In re A.B.*, 272 N.C. App. 13, 16, 844 S.E.2d 368, 371 (2020) (determining that "mother's failure to raise a timely objection" was a failure to properly preserve the issue for appeal and

"thus waives the issue on appeal").

¶ 21        Furthermore, even if we did consider Mother's argument, it is without merit. Trial courts have "broad discretionary power to supervise and control the trial" which we will not disturb absent an abuse of discretion. *State v. Mack*, 161 N.C. App. 595, 598, 589 S.E.2d 168, 171 (2003) (citation omitted). This Court has held that even "extremely pointed" comments by the trial court did not "show a preexisting bias against plaintiff or a prejudging of her case" when its opinions and remarks were based upon evidence at trial. *Hancock v. Hancock*, 122 N.C. App. 518, 528, 471 S.E.2d 415, 421 (1996).

¶ 22        Mother contends that various remarks by the trial court showed a bias against her, but we disagree. Our review of the record shows that the trial court's remarks, even if considered "pointed," were made to all parties, including a DSS social worker who testified at the hearing, and not just Mother. Moreover, the comments pertained to the proceedings in her case and were based on the evidence it heard during the hearing; the trial court's comments did not show a bias against her or a prejudging of her case. *Hancock*, 122 N.C. App. at 528, 471 S.E.2d at 421.

### 3. *Visitation*

¶ 23        Mother lastly argues that "the trial court had discretion to grant [Mother] visitation. But it believed it did not, so it erred by denying [Mother's] visitation."

¶ 24        We review disposition orders for abuse of discretion only. *In re CM*, 183 N.C.

App. 207, 215, 644 S.E.2d 588, 595 (2007). "A trial court may be reversed for abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." *In re J.B.*, 172 N.C. App. 1, 14, 616 S.E.2d 264, 272 (2005) (citation omitted).

"An order that . . . continues the juvenile's placement outside the home shall provide for visitation that is in the best interests of the juvenile consistent with the juvenile's health and safety, including no visitation." N.C. Gen. Stat. § 7B–905.1(a) (2021). The order must establish a visitation plan for parents unless the trial court finds "that the parent has forfeited their right to visitation or that it is in the child's best interest to deny visitation." *In re T.H.*, 232 N.C. App. 16, 34, 753 S.E.2d 207, 219 (2014) (quotation marks and citation omitted). This Court has previously held that a trial court did not abuse its discretion in denying visitation when the "Mother was awaiting trial on criminal charges for her alleged [] abuse" of her child and when "the court received evidence that Mother remained subject to a no contact order in her criminal case." *In re T.W.*, 250 N.C. App. 68, 78, 796 S.E.2d 792, 798 (2016).

While Mother's argument is not clear, we construe her argument to be that the trial court's remarks from the bench indicate that it acted under a misapprehension of law when "it believed it lacked discretion to grant [Mother] visitation." Mother specifically notes that the trial court stated that "there cannot be any visitation due to what's set forth by superior court" and claims that this misapprehension of law

constitutes an abuse of discretion. However, we do not construe the trial court's remarks as an indication that it acted under a misapprehension of law, particularly in light of its unchallenged findings of fact which are binding on appeal.

The trial court made the following relevant findings of fact:

> 53. [Mother] does not have any court ordered visitation with the juveniles. Neither the Department nor the Guardian ad Litem are recommending a change in the visitation. It is not in the juveniles' best interests to have visitation with the mother as it would be contrary to the health and safety of the juveniles.
>
> . . . .
>
> 56. The mother has pending criminal charges in Randolph County as follows: Unsafe Movement (2counts); DWLR Not Impaired Revocation (2 counts) with a pending trial date of June 14, 2021; and Child Abuse in which the last court date was held on April 22, 2021. The Child Abuse charge is related to the allegations contained in the Petition. . . .
>
> . . . .
>
> 63. On March 17, 2021, ADA Thompson informed Social Worker Boyd that she is preparing plea offers and discovery for the Felony Child Abuse case. She is moving forward to fully prosecute [Mother]. . . .

The trial court then concluded as law that it was "not in the best interests of the juveniles to have visitation with the mother or father pursuant to N.C. Gen. Stat. § 7B-905.1." As the trial court's findings of fact support its conclusion of law support that it was not in the best interests of the children to see Mother, the trial court did not abuse its discretion when it declined to grant visitation to Mother. *See In re T.H.*,

232 N.C. App. at 34, 753 S.E.2d at 219.

## B. Father's Appeal

### 1. Visitation

¶ 29      Father first argues that the trial court abused its discretion when it suspended Father's visitation with the children "because the evidence failed to support the suspension of his visits with those children."

¶ 30      We review disposition orders for abuse of discretion only. *In re CM*, 183 N.C. App. at 215, 644 S.E.2d at 595. "A trial court may be reversed for abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." *In re J.B.*, 172 N.C. App. at 14, 616 S.E.2d at 272 (citation omitted). Unchallenged findings of fact are "deemed to be supported by the evidence and are binding on appeal." *In re J.C.M.J.C.*, 268 N.C. App. at 51, 834 S.E.2d at 673-74 (citation omitted).

¶ 31      A disposition order must establish a visitation plan for parents unless the trial court finds "that the parent has forfeited their right to visitation or that it is in the child's best interest to deny visitation." *In re T.H.*, 232 N.C. App. at 34, 753 S.E.2d at 219 (quotation marks and citation omitted). An order denying visitation must contain sufficient findings to explain why visitation is not in the child's best interests. *In re N.K.*, 274 N.C. App. 5, 11, 851 S.E.2d 389, 394 (2020). This Court has affirmed orders denying visitation when parents have failed to comply with mental health and

substance abuse treatment services. *See In re T.W.* And this Court has recognized that a parent's pending criminal charge can justify a denial of visitation where the charge arose from the alleged abuse of the parent's child. *Id.* at 78, 796 S.E.2d at 798.

¶ 32 Father challenges portions of finding of fact 64; the remaining unchallenged findings are binding on appeal. The trial court's relevant, unchallenged findings of fact include:

> 27. Based on the above Findings of Fact, the juvenile [Nancy] is ADJUDICATED ABUSED, as the parents created or allowed to be created a substantive risk of serious physical injury to the juvenile by other than accidental means. In addition, the parents have created or allowed to be created serious emotional damage to the juvenile. Testimony was uncontroverted that the juvenile was diagnosed with severe malnourishment, failure to thrive with significant cognitive delays and non-verbal issues. [Nancy] gained four pounds during her hospitalization and it was not medically possible for her to have lost the amount of weight due to Norovirus. There was no medical reason for [Nancy's] lack of gaining weight while in the custody of [Mother and Father] and she gained weight during her hospital stay.
>
> 28. Based on the above Findings of Fact, the juveniles: [Naomi, Timothy, and Cameron] are ADJUDICATED NEGLECTED, as the juveniles did not receive proper care, supervision and discipline from the parents, and live in an environment injurious to their welfare. [Naomi] did not receive appropriate medical care and the juveniles were in the home when [Nancy] was malnourished and kept in her room. [Naomi, Timothy, and Cameron] all witnessed their sister's maltreatment and both [Timothy and Naomi] gave statements as to the mistreatment.

. . . .

36. [Timothy] completed a Comprehensive Clinical Assessment (CCA) on June 21, 2019 with Danielle Harper. On April 29, 2019, a forensic interview was completed indicating the allegations contained in the petition were true and charges have since been filed on both parents. . . .

. . . .

57. The father entered into a case plan with the Department on July 15, 2019; and most recently updated on April 12, 2021. The current case plan contains the following components:

- **Parenting Skills: Participate in a parenting psychological assessment and comply with any recommendations; successfully complete the Parenting Assessment Training and Education (PATE) Program; attend all visits, as scheduled, and comply with the visitation expectations once allowed by the court; and enter into a voluntary support agreement with Child Support Enforcement.** . . . [Father] has not provided a copy of [his] assessment nor signed a Release of Information in order for the Department to obtain this information. . . . As of today's date, no consents have been provided to the Department. . . .

  . . . .

  On July 9, 2020, [Father] was arrested and charged for possession of drug paraphernalia. . . . [Father] has indicated that he will not change his narcotic medication.

  . . . .

  On August 15, 2019, Social Worker . . . spoke with Benita Hoover, Program Coordinator of DVIP. Ms.

> Hoover confirmed that the last time [Father] participated in DVIP was in 2010 and he did not complete the program at that time, as he would not admit to being the perpetrator of abuse. [Father] indicated that he will still not admit to being the perpetrator of abuse. . . . [Father] has failed to admit that he has been the perpetrator of domestic violence despite criminal convictions for Felony Assault by Strangulation and Assault on a Female.
>
> . . . .
>
> . . . .
>
> 62. [Father] is currently on probation and has pending criminal charges with upcoming hearing dates as follows: Aiding and Abetting and Child Abuse-Inflicting Serious Mental or Physical. . . . .
>
> 63. On March 17, 2021, ADA Thompson informed Social Worker Boyd that she is preparing the plea offers and discovery for the Felony Child Abuse case. She is moving forward to fully prosecute [Mother]. She stated that [Father's] case is not dropped or dismissed. He is still facing the charges of Aiding and Abetting Child Abuse. ADA Thompson stated that she does not have any intent of dropping the case. . . .

¶ 33    The trial court then concluded as law that it was "not in the best interests of the juveniles to have visitation with the mother or father pursuant to N.C. Gen. Stat. § 7B-905.1." The findings show that: Father created or allowed to be created a substantive risk of serious physical injury and serious emotional damage for Nancy; Naomi, Timothy, and Cameron all witnessed Nancy's mistreatment and malnourishment; Father had complied with only some of his case plan tasks; Father

did not follow through with recommended psychiatric care; Father would not sign releases to allow DSS to learn about Father's participation in counseling; and that Father had a pending criminal charge for felony aiding and abetting child abuse. These unchallenged findings of fact amply support the trial court's conclusion of law that visitation with Father was not in the best interests of the juveniles, and we thus determine that the trial court did not abuse its discretion in denying visitation. *See In re T.H.*, 232 N.C. App. at 34, 753 S.E.2d at 219.

## 2. *Review of Visitation Plan*

¶ 34 Father lastly argues that "the trial court reversibly erred by failing to inform [Father] of his right to move for a review of the trial court's visitation plan."

¶ 35 This Court reviews de novo whether a trial court correctly adhered to a statutory mandate and, if there was error, whether such error was harmless. *In re E.M.*, 263 N.C. App. 476, 478-79, 823 S.E.2d 674, 676 (2019).

¶ 36 At the time of the hearing on 26 May 2021, N.C. Gen. Stat. § 7B-905.1(d) required that if "the court retains jurisdiction, all parties shall be informed of the right to file a motion for review of any visitation plan[.]" N.C. Gen. Stat. § 7B-905.1(d) (effective until 30 September 2021). It also required the trial court review the case "within 90 days from the date of the initial dispositional hearing[.]" N.C. Gen. Stat. § 7B-905(b) (effective until 30 September 2021). This Court has held that failing to inform the parties of their right to file a motion for review is reversible error, even

though the trial court is required to hold a hearing within 90 days in any case. *In re K.W.*, 272 N.C. App. 487, 497, 846 S.E.2d 584, 591 (2020). Recognizing the inconsistency, the General Assembly amended the statute; it now provides, "If the court *waives permanency planning hearings* and retains jurisdiction, all parties shall be informed of the right to file a motion for review of any visitation plan[.]" N.C. Gen. Stat. § 7B-905.1(d) (effective 1 October 2021) (emphasis added).

¶ 37        We agree with Father that the trial court was required to, but did not, inform him of his right for review of any visitation plan; however, this error was harmless because the trial court immediately scheduled the next hearing date and Father was aware of the newly scheduled hearing date. The trial court did not fail to inform Father of his right for review *and* waive permanency planning hearings, a situation for which the updated statute contemplates and provides. Thus, while the trial court erred in failing to inform Father of his right for review of any visitation plan, the error was harmless. *In re E.M.*, 263 N.C. App. at 479-80, 823 S.E.2d at 676-77.

### III.    Conclusion

¶ 38        The trial court's unchallenged findings of fact support its conclusions of law that DSS made reasonable efforts to prevent placement of the juveniles outside the home and that it was not in the best interest of the juveniles to have visitation with Mother and Father. Additionally, while the trial court erred in failing to inform Father of his right for review of visitation, such error was harmless.

AFFIRMED.

Judges HAMPSON and GORE concur.